**UNITED STATES of America, Plaintiff,**

v.

**Preston WOODRUFF, Defendant.**

**Case No. 09–20153.**

United States District Court, W.D. Tennessee, Western Division.

Nov. 17, 2011.

Jennifer Lawrence Webber, U.S. Attorney's Office, Memphis, TN, for Plaintiff.

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORTS AND RECOMMENDATIONS AND DENYING DEFENDANT'S MOTIONS TO SUPPRESS**

SAMUEL H. MAYS, JR., District Judge.

Before the Court are Defendant Preston Woodruff's ("Woodruff") January 21, 2010 Motion to Suppress (Mot. to Suppress and Supporting Mem., ECF No. 31 ("First Mot. to Suppress")) and September 9, 2010 Motion to Suppress (Mot. to Suppress Statements and Supp. Memorandum, ECF No. 61 ("Second Mot. to Suppress")), along with the objections to Magistrate Judge Diane K. Vescovo's Reports and Recommendations that Woodruff filed on June 29, 2010, and August 18, 2011, respectively. (Def.'s Objections to the Magistrate's Report and Recommendation on Def.'s Mot. to Suppress, ECF No. 55 ("First Objection"); Def.'s Objections to the Magistrate's Second Report and Recommendation on Defendant's Second Mot. to Suppress, ECF No. 115 ("Second Objection").) The United States responded to Woodruff's objections on September 29, 2011. (Resp. to Def.'s Obj. to the Magistrate Judge's Reports Recommending Denial of the Def.'s First and Second Mots. To Suppress, ECF No. 119 ("Govt.'s Resp.").)

The Magistrate Judge recommended that the Court deny both of Woodruff's Motions to Suppress. (Report and Recommendation on Defendant's Mot. to Suppress, ECF No. 47 ("First Report"); Report and Recommendation on Def.'s Mot. to Suppress, ECF No. 107 ("Second Report").) Woodruff's objections are not well taken. The Court ADOPTS the Reports and Recommendations of the Magistrate Judge. The Motions to Suppress are DENIED.

### I. Procedural and Factual Background [1]

On the evening of April 4, 2009, and during the early morning hours of April 5, 2009, Detectives Michael Britton ("Detective Britton") and Billy Jackson ("Detective Jackson") (collectively "the Detectives") were patrolling the area near the intersection of Comanche and Getwell roads in Memphis, Tennessee. The Detectives had been assigned to that area because it was considered a "hot spot" for robberies of Hispanics, particularly at night. Between 11:00 p.m. and 12:00 a.m., the Detectives saw Woodruff head north on Getwell through a red light while making a left turn into the Kensington Manor Apartment Complex. The Detectives conducted a traffic stop of Woodruff's vehicle outside the Kensington Manor Complex. During that stop, Detective Britton used his patrol car's spotlight to look through the rear window of Woodruff's vehicle. Britton saw the driver and passenger making suspicious movements. Detective Britton asked Woodruff for identification, which Britton then scanned using a portable computer that he has referred to as a PDA (Britton, 5/04/2010 Suppression Hearing Tr. 20, ECF No. 74.) The scan revealed that Woodruff had an outstanding arrest warrant for aggravated robbery. The Detectives immediately placed Woodruff under arrest, patted him down, and placed him in the squad car. During the pat down, the Detectives discovered three IDs picturing Hispanic individuals (the "IDs") and a social security card for an unidentified fourth person. When Detective Britton asked Woodruff how he had obtained the IDs (the "First Interrogation"), Woodruff explained that he had found them in his vehicle (the "First Statement").

The Detectives then conducted a search of Woodruff's vehicle incident to his arrest. The search revealed a chrome Lorcin L25 .25 caliber semi-automatic handgun loaded with six Winchester rounds in the clip and one in the chamber. The Detectives also found a maroon ski mask with holes cut into it, a Tennessee Lottery baseball cap with red Jamaican braids attached to it, photos of Woodruff and Woodruff's passenger, Cory Lee Fulford, and four cell phones. Woodruff was transferred to the Memphis Police Department office on Channel 3 Drive.

When the Detectives arrived at the office, Lieutenant Wright informed them that Woodruff and Fulford had been involved in a 2005 robbery, that their nicknames were Dinosaur and Gorilla, and that they had participated in several robberies of Hispanics. Detective Britton interrogated Woodruff in an interview room after giving him his *Miranda* rights orally and in writing and provided Woodruff with an Advice of Rights Form (the "Second Interrogation"). Woodruff chose to give a statement, in which he repeated the claim that he had found the IDs in his car (the "Second Statement").

Woodruff was later interviewed by Sergeant Rosario ("Sergeant Rosario"), an officer assigned to the Robbery Squad at the time of Woodruff's arrest and the lead investigator for robberies of Hispanics. Sergeant Rosario interrogated Woodruff on April 5, 2009, at 1:30 p.m. (the "Third Interrogation").[2] Before the Third Interrogation, Sergeant Rosario reminded

---

1. All facts are taken from the Magistrate Judge's Proposed Findings of Fact unless otherwise noted. (First Report 2–8; Second Report 3–10.) The Proposed Findings of Fact provide context. Woodruff's factual objections are addressed in the Analysis.

2. At the time Sergeant Rosario interviewed Woodruff, no robbery report had been filed for the IDs.

Woodruff that he had been advised of his rights earlier that morning and that they were still in effect.

Woodruff said he was on supervised federal release and provided the name of a known robber and information about a murder and denied any involvement in a robbery. Woodruff claimed he had received the IDs from a dark-skinned female named Rolanda and identified her from a photograph (the "Third Statement"). The interview ended at 5:25 p.m., and Woodruff was returned to his cell with no visible injuries.

Sergeant Rosario testified that on April 6, 2009, at 8:00 a.m., he was assigned to investigate a robbery of Hispanics. The victims were the same individuals whose IDs had been found on Woodruff. On Tuesday, April 7, 2009, Sergeant Rosario met with the victims and showed them a photographic lineup. The victims identified Woodruff. Based on this information, Sergeant Rosario interrogated Woodruff again. Woodruff was orally advised of his *Miranda* rights and signed the Advice of Rights Form at 5:15 p.m., after saying he wished to make a statement (the "Fourth Interrogation").

Woodruff admitted the robbery of the Hispanics whose identity cards had been stolen and said he had been armed with a chrome gun he had found in the car. He reiterated that the car belonged to his girlfriend. Woodruff signed his statement at 6:43 p.m. (the "Fourth Statement").

Woodruff has been charged with possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 1.) The firearm alleged is the Lorcin L25 .25 caliber semiautomatic handgun found in the vehicle he was driving on April 5, 2009. (*Id.*) Woodruff has filed two motions in which he seeks to suppress "any and all physical evidence" obtained "as a direct or indirect result" of the traffic stop on April 5, 2009 (First Mot. to Suppress 2) and "any and all statements taken from him at the scene of the arrest and subsequently given while in formal custody." (Second Mot. to Suppress 2.)

The Magistrate Judge has recommended that the Court deny both Motions to Suppress. (First Report; Second Report.) Woodruff has filed two objections. In the first, he contends that the Detectives' testimony was incredible, that he was stopped and detained without reasonable suspicion or probable cause, and that the warrantless search of his vehicle was unreasonable and violated his Fourth Amendment rights. (*See* First Objection.) In the second objection, Woodruff contends that the motion to suppress his Statements should be granted because the police violated his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (*See* Second Objection).

## II. Standard of Review

A "district judge must determine *de novo* any part of a magistrate judge's disposition that has been properly objected to." Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). "It is well-settled that upon proper objection by a party, a district court must review de novo a magistrate judge's ruling on a motion to suppress." *United States v. Quinney,* 238 Fed.Appx. 150, 152 (6th Cir.2007) (citations omitted). The district court need not review, under a de novo or any other standard, those aspects of a magistrate judge's report and recommendation to which no specific objection is made. *See Thomas v. Arn,* 474 U.S. 140, 149–50, 106 S.Ct. 466,

88 L.Ed.2d 435 (1985); *United States v. Robinson*, 352 Fed.Appx. 27, 28–29 (6th Cir.2009).

■ "When a magistrate's findings and recommendations rest upon the evaluation of the credibility of a witness, the district court is not required to rehear the testimony in order to conduct a de novo determination of the issues." *United States v. Bermudez*, No. 99–6097, 2000 WL 1871676, at *3, 2000 U.S.App. LEXIS 33159, at *8–9 (6th Cir. Dec. 11, 2000) (citing *United States v. Raddatz*, 447 U.S. 667, 675–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). "Credibility determinations of the magistrate judge who personally listened to the testimony ... should be accepted unless in [its] de novo review of the record [the district court] finds a reason to question the magistrate judge's assessment." *United States v. Johnson*, No. 10–20176, 2011 WL 3844194, at *2, 2011 U.S. Dist. LEXIS 97577, at *6–7 (W.D.Tenn. Aug. 30, 2011) (citations omitted).

### III. Analysis

Woodruff contends that: 1) the Magistrate Judge's factual findings about the circumstances surrounding the traffic stop are erroneous because the Detectives' testimony was contradictory (First Objection 3–8); 2) there was no reasonable suspicion to justify an investigative traffic stop (*Id.* 8); 3) the automobile exception does not apply because the only basis to search Woodruff's car was a statement that should have been excluded, and the inventory search exception does not apply (*Id.* 9); 4) the Magistrate Judge's factual findings about the Interrogations are erroneous because Sergeant Rosario could not recall how many times he had spoken with Woodruff and the Magistrate Judge found that Woodruff had received a *Miranda* warning when he had not (Second Objection 4); and 5) all of Woodruff's State-ments to the police should have been excluded under *Miranda*. (*Id.* 5.)

### A. Factual Objections in the First Objection

Woodruff objects to the Magistrate Judge's finding that the Detectives were credible based "solely on the fact that they testified consistent with one another." (First Objection 3.) The Magistrate Judge accepted the Detectives' testimony because "Jackson's testimony mirrored that of [Britton] concerning the events surrounding the traffic stop and the arrest." (First Report 7.) The Magistrate Judge noted that:

> Both officers testified that their patrol car arrived at the intersection of Getwell and Comanche first; that when they arrived the light was red; that the defendant's vehicle was not already out in the intersection before the light changed to red; and that the defendant made an illegal left hand turn into the apartments. Finally, both officers also testified consistently that Woodruff's vehicle was stopped in the entry area to the apartment complex not in a parking space as claimed by the Defendant.

(First Report 7–8.)

Woodruff contends that there "is an insufficient basis upon which to find that the [Detectives] were credible and that [Woodruff's] version of the events was not credible." (First Objection 3.) He objects to the Magistrate Judge's findings of credibility because "there were conflicts in the testimony between the Government witnesses and there were also conflicts between the Government's witnesses and the testimony of the Defense witnesses that the Magistrate Judge failed to resolve." (First Objection 4.) Woodruff identifies contradictions about who was driving the Detectives' vehicle (*Id.* 4), argues that Detective Britton's description of how Woodruff's vehicle passed the Detectives' vehicle

is impossible (*Id.* 5), and asserts an inconsistency in the Detectives' testimony about where Woodruff stopped. (*Id.* 6.) These contentions are without merit.

Woodruff cites the transcript to identify conflicts, but the transcript makes clear that there are no material contradictions. Woodruff first contends that "Detective Britton testified that he was driving ... [but] [l]ater ... Detective Jackson testified that he was driving." (First Objection 4.) Detective Britton did testify that "[he] was driving" the vehicle. (Detective Britton, 5/04/2010 Suppression Hrg. 20, ECF No. 74.) Detective Jackson's statement, however, was made in response to a question by Woodruff's counsel about whether Jackson had noticed traffic coming through the intersection at Getwell and Comanche. (*Id.* 99.) Detective Jackson responded that he "wasn't paying any attention." (*Id.*) When pressed by counsel, Detective Jackson testified that "you just don't look straight when you're driving. So, I [wasn't] paying any attention." (Detective Jackson, 05/04/2010 Suppression Hrg. 100.) This statement is ambiguous; Detective Jackson could have meant that he was driving the vehicle or that he was merely a passenger. It would require a strained reading to conclude, as Woodruff suggests, that Detective Jackson meant he routinely does not look straight ahead while driving a car. Jackson's statement more plausibly means that, when he is a passenger in a car, he does not pay close attention and "just [doesn't] look straight." (*Id.*)

Even if the testimony were inconsistent, the "alleged inconsistency" "bear[s] only on [a] collateral fact[ ]." *United States v. Miller*, 413 Fed.Appx. 841, 843 (6th Cir. 2011). *See also United States v. Clark*, 136 Fed.Appx. 831, 835–36 (6th Cir.2005) (finding collateral inconsistencies irrelevant when material statements were con-

sistent). Woodruff asks the Court to find that "nothing [the officers] said was credible because a few of the minor details ... were arguably inconsistent." *United States v. Craig*, 198 Fed.Appx. 459, 465 (6th Cir.2006).

Woodruff's contention that "Detective Britton's version of the events regarding where the vehicles were located is a factual impossibility" is also unavailing. (First Objection 5.) Woodruff contends that Detective Britton testified that the Detectives' vehicle was in the far right lane and that Woodruff's vehicle passed directly in front of it to enter the Kensington Manor Apartment Complex. (First Objection 6.) Woodruff contends that Britton's testimony "is not credible," because his description would require Woodruff's vehicle to "go[ ] directly against oncoming traffic." (*Id.*) Detective Britton testified that the Detectives were driving south on Getwell, with the Kensington Apartments on their right. (Detective Britton, 5/04/2010 Suppression Hr'g 16.) He testified that Woodruff's car was traveling north on Getwell and "turned in front of [him]." (*Id.* 16–17.) Detective Britton's testimony is credible. To make a left turn into the Kensington Manor Apartment Complex while driving north on Getwell, Woodruff's automobile *had* to pass in front of cars driving south on Getwell. There is no physical impossibility in Britton's testimony, and nothing incredible about suggesting a car turned in front of the Detectives when it made a left turn into the apartments.

Woodruff also contends that the Detectives' testimony is inconsistent about where Woodruff's vehicle stopped. (First Objection 6.) That argument is not well taken. Detective Britton described the location of the stop as an entry driveway into the Kensington Manor Apartment Complex and testified that there is a "cen-

ter section [in the driveway] with a keypad." (Detective Britton, 5/04/2010 Hr'g 18.) Detective Britton testified that Woodruff "stopped directly in that.... It was pretty much blocking traffic inside the apartment[s]." (*Id.* 18–19.) Detective Jackson testified that Woodruff stopped "right past the keypad." (*Id.* 92.) Detective Jackson's testimony corroborates Detective Britton. Detective Jackson testified that Woodruff's car blocked the exit and that it was in the middle of the road. (*Id.* 93.) The Detectives described the same location, but used slightly different wording. Any inconsistencies "relate to collateral facts; they do not undermine [the] consistently material testimony." *Clark,* 136 Fed.Appx. at 834; *see also United States v. Robinson,* 78 Fed.Appx. 501, 504 (6th Cir.2003) (finding officers' testimony "consistent in all relevant respects.").

Woodruff asserts inconsistencies that are minor at best. The testimony here is consistent in all material respects. Courts may conclude that the "consistency of two officers' accounts" indicates that their statements are credible. *United States v. Garrido,* 467 F.3d 971, 979 (6th Cir.2006); *see also United States v. Simmons,* 174 Fed.Appx. 913, 917 (6th Cir.2006) (finding officers' testimony credible because it was substantively consistent); *United States v. Craft,* 150 Fed.Appx. 413, 416 (6th Cir. 2005) (finding officers credible because they "testified consistently, one with the other."). The officers testified consistently about the time and location of the arrest (5/04/2010 Suppression Hr'g 83–5, 91–4.) They testified that Woodruff drove through the intersection at Getwell and Comanche before the light turned red and illegally turned into the apartment complex. (*Id.* 15–16, 89–90.) They testified consistently that Woodruff's vehicle was stopped in an entry to the complex. (*Id.* 17–19, 92–93.) Their testimony is credible.

■ Woodruff's contention that the officers did not have a reasonable suspicion to justify an investigative traffic stop depends on his claim that there was a "clearly erroneous finding of fact that [Woodruff] made a left turn." (First Objection 8.) That claim is not well taken. The officers had a reasonable, articulable basis to stop Woodruff; they saw him violate a traffic law. "A police officer may effect a traffic stop of any motorist for any traffic infraction." *United States v. Townsend,* 305 F.3d 537, 541 (6th Cir.2002). "[A] roadside detention is lawful so long as the officer has probable cause to believe that the motorist violated the traffic laws." *Garrido,* 467 F.3d at 977–78.

Woodruff has shown no basis in the record to "set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." *Peveler v. United States,* 269 F.3d 693, 702 (6th Cir.2001); *see also Moss v. Hofbauer,* 286 F.3d 851, 868 (6th Cir.2002). Because the record contains "no compelling reason to second-guess the Magistrate Judge's decision," her credibility determinations must stand. *United States v. Freeman,* 412 Fed.Appx. 735, 743 (6th Cir.2010). The initial stop was not unlawful.

**B. The Search of Woodruff's Vehicle**

Woodruff contends that the search of the automobile he was driving was unconstitutional because that search was the product of an involuntary statement. (First Objection 9.) Woodruff also contends that the Magistrate Judge implicitly relied on Woodruff's statement to the police to determine probable cause. (*Id.* 10–11.) Finally, Woodruff contends that the inventory exception does not apply and that there was no inevitable discovery because the true owner of the car, Celestine Evans ("Evans"), was not given a chance

to have the vehicle retrieved from the scene.[3] (*Id.* 13.)

The Fourth Amendment guarantees the right to be secure "against unreasonable searches and seizures," U.S. Const. amend. IV, and any search without a warrant is "per se unreasonable." *United States v. Pearce*, 531 F.3d 374, 379 (6th Cir.2008) (quoting *United States v. Roark*, 36 F.3d 14, 17 (6th Cir.1994)). Warrantless searches of vehicles incident to arrest are justified when it is reasonable to believe that relevant evidence will be found in the vehicle, or when there is a legitimate concern for officer safety. *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 1717–20, 173 L.Ed.2d 485 (2009). The Magistrate Judge concluded that that officer safety did not justify a search of Woodruff's automobile because "he was not within reaching distance of his vehicle at the time of his arrest." (First Report 10–11.) Thus, under *Gant*, there was no legitimate safety concern. *Gant*, 129 S.Ct. at 1723–24.

In its response, the Government contends that, even if the search were unconstitutional under *Gant*, it would be admissible under the good-faith exception. (Govt.'s Resp. 8.) "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that the exclusion can meaningfully deter it. . . . [E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may be properly charged with knowledge, that the search was unconstitutional.' " *Herring v. United States*, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (quoting *Illinois v. Krull*, 480 U.S. 340, 348–349, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987)). As the Gov-

ernment notes, Woodruff's arrest took place on April 5, 2009, and *Gant* was not decided until April 21, 2009.

Before *Gant*, "[t]he Sixth Circuit was among the legion of courts" that allowed "a vehicle search incident to the arrest of a recent occupant even if there was no possibility that the arrestee could gain access to the vehicle at the time of the search." *United States v. Buford*, 632 F.3d 264, 274 (6th Cir.2011) (internal quotations omitted). In *Buford*, the Sixth Circuit upheld a search that was constitutional before *Gant*, but unconstitutional afterward. The court concluded that " 'penalizing the officer for the court's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.' " *Id.* at 276 (quoting *United States v. Leon*, 468 U.S. 897, 920–21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). Because the Sixth Circuit has held that evidence from a search conducted before *Gant* and lawful under Sixth Circuit authority at the time should not be excluded, the good-faith exception applies to the search here.

Even without relying on the good-faith exception, the automobile exception, as the Magistrate Judge noted, would have allowed a search. (First report 12.) The automobile exception allows police to search an automobile if they have probable cause to believe it contains evidence of criminal activity. *United States v. Ross*, 456 U.S. 798, 807–8, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Woodruff does not dispute that the automobile exception would apply if probable cause existed, but contends that there was no probable cause to search his vehicle. (First Objection 10.) The Magistrate Judge concluded that there was probable cause because the area was known to police as a hot spot for

---

**3.** The Magistrate Judge noted that Evans was in North Dakota at the time of the arrest.

(First Report 16.)

robberies of Hispanics, the driver and passenger were observed making suspicious movements during the stop, and a search of Woodruff's person produced three IDs bearing Hispanic surnames. (First Report 14.)

Woodruff contends that the Magistrate Judge's finding of probable cause is erroneous because, subjectively, the Detectives relied on Woodruff's statement that he found the IDs in the car. (First Objection 10.) Detective Britton testified that, when he searched Woodruff and found the IDs in his pocket, Britton could tell that the cards belonged to Hispanic individuals. (Detective Britton, 05/14/2010 Suppression Hr'g 21–22.) Britton asked Woodruff "whose IDs [they] were and why did [he] have them. He advised [Detective Britton] that he found them on the seat of his car and he just put them in his pocket." (*Id.* 22.) Woodruff contends that this statement was involuntary under *United States v. Patane* and that all evidence in the car must be suppressed. 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). According to Woodruff, even if the Court does not exclude the evidence on the basis of *Patane*, the Detectives relied on his involuntary statement in determining probable cause and the evidence should be excluded. Neither argument is well taken.

In *Patane*, the Supreme Court held that "the core protection afforded by the Self–Incrimination Clause is a prohibition on compelling a criminal to testify against himself at trial." 542 U.S. at 637, 124 S.Ct. 2620. Holding that "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule," the Supreme Court noted that " '[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived *Miranda* violation." *Id.* at 641, 124 S.Ct. 2620 (quoting *Chavez v. Martinez*, 538

U.S. 760, 790, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003)). The court concluded found that introduction of the physical fruits of a *Miranda* violation "does not implicate the Self–Incrimination Clause." *Patane*, 542 U.S. at 643, 124 S.Ct. 2620.

█ Woodruff contends that his statement was involuntary, but provides no evidence to support that contention. (First Objection 9.) To determine whether a statement is involuntary, courts look to "the totality of the circumstances." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999). Three factors affect the voluntariness of a statement: whether "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Id.*

There is no evidence that Woodruff was coerced into explaining where the IDs came from; rather, he voluntarily stated he had found them in the car. There is no indication that his will was overborne. His initial explanation was exculpatory and later recanted, suggesting he was acting of his own free will. Nor is there any evidence that the failure to give a *Miranda* warning was the crucial factor motivating Woodruff's statement. "The use of a single handcuff does not support finding that the defendant's will was overborne." *United States v. Stokes*, 631 F.3d 802, 809 (6th Cir.2011). Absent evidence of coercion, the evidence in the car is admissible.

Woodruff next contends that the officers used his involuntary statement to determine probable cause and that, without that statement, there would have been no probable cause to search his vehicle. (First Objection 10.) Probable cause is "an objective standard," not a subjective one. *United States v. Cooper*, 1 Fed.Appx. 399, 403 (6th Cir.2001). Probable cause consid-

ers whether "the facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person, or one of reasonable caution" to believe "that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). "Probable cause requires only the probability of criminal activity, not some type of 'prima facie' showing." *Jolley v. Harvell*, 254 Fed. Appx. 483, 486 (6th Cir.2007).

The facts demonstrate that the officers observed suspicious movement on the part of a suspect who possessed several IDs belonging to Hispanic individuals in a neighborhood where Hispanics were prone to be robbed. Taken together, these facts alone establish probable cause to search the vehicle for evidence of robbery. Having found evidence of criminal activity, there was "a fair probability that contraband or evidence of a crime" would be found in the vehicle Woodruff was driving. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

■ Grounds to search Woodruff's automobile also existed under the inevitable discovery doctrine because the police would have been allowed to perform an inventory search. *Colorado v. Bertine*, 479 U.S. 367, 374, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). Woodruff contends that the car's owner, Evans, "was not given a chance, under the Memphis Police Department's Towing Policy, to have the vehicle retrieved by someone from the scene." (First Objection 13.)

■ "In order to be valid, inventory searches must be conducted 'according to standard police procedures' and may not be undertaken 'for the purposes of investigation.'" *United States v. Lilly*, 438 Fed. Appx. 439, 442 (6th Cir.2011) (quoting *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir.1998)). Woodruff does not

contend that the police failed to follow standard police procedures. Indeed, he could not because, as the Magistrate Judge noted, "Woodruff's vehicle [c]ould have been towed and inventoried in accordance with the [Memphis Police Department] policy." (First Report 16.) Woodruff contends that the Detectives were under a duty to inform Evans that the individual driving her vehicle had been arrested, to wait with the vehicle until she called someone to pick it up and that someone had arrived, and then to give that person the keys to the vehicle. (First Objection 12.)

■ Woodruff cites no authority, and this Court finds none, to support this new requirement. To the contrary, police need only show "at least one ground for impoundment." *Lilly*, 438 Fed.Appx. at 443. Woodruff does not dispute that his vehicle was blocking traffic and that it could not have been left where it was. There does not need to be "a determination of whether there was in fact a need ... to impound the [vehicle]; instead we are required to determine whether ... the decision to impound was reasonable under the circumstances." *Collins v. Nagle*, 892 F.2d 489, 494 (6th Cir.1989). When an inventory search is conducted "pursuant to a reasonable and mandatory police department practice," it is constitutional. *United States v. Ballard*, 432 Fed.Appx. 553, 557 (6th Cir.2011). Because "the gun ... would have inevitably been found during the inventory search," there was no error to justify the use of the exclusionary rule. *United States v. Vite–Espinoza*, 342 F.3d 462, 471 (6th Cir.2003).

### C. Factual Objections in the Second Objection

Woodruff "asserts that there is an insufficient basis upon which to find that the witnesses were credible." (Second Objec-

tion 4.) Woodruff objects to the Magistrate Judge's determination about Sergeant Rosario's credibility and contends that Rosario was not credible because he did not recall whether he had spoken to Woodruff one or two times until Rosario was shown Woodruff's detention records at the April 18, 2011 suppression hearing. (*Id.* 4; Sergeant Rosario, 4/18/2011 Suppression Hr'g 55–56, ECF No. 98.) Sergeant Rosario testified in March that he had informed Woodruff, during Woodruff's Third Interrogation, that his *Miranda* rights still applied. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 65–67, ECF No. 99; Second Report 8.) Sergeant Rosario also testified in March that he had orally advised Woodruff of his *Miranda* rights before the Fourth Interrogation and had him sign an Advice of Rights Form. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 73–74; Second Report 9.)

Woodruff argues that Sergeant Rosario is not credible because he could not recall specifically whether he had talked to Woodruff more than once after Woodruff's arrest. It was not until the April 18, 2011 hearing, when records were introduced showing that Sergeant Rosario had spoken to Woodruff twice, that Sergeant Rosario recalled speaking on two occasions. (Second Objection 4; sergeant Rosario 4/18/2011 Supression Hr'g 65.)

This Court is " 'both statutorily and constitutionally required' to engage in a de novo review" of Sergeant Rosario's credibility. *United States v. Burcham,* 388 Fed.Appx. 478 (6th Cir.2010) (quoting *United States v. Worley,* 193 F.3d 380, 383 n. 6 (6th Cir.1999)). After reviewing the record, and recognizing that "a magistrate judge is in the better position to assess the credibility of witnesses he sees and hears," there is no reasonable basis to question Sergeant Rosario's credibility. *United States v. Robinson,* No. 1:07–CR–1, 2007

WL 2138635, at *1, 2007 U.S. Dist. LEXIS 53290, at *1 (E.D.Tenn. July 23, 2007).

Sergeant Rosario testified in depth about the circumstances surrounding his interrogation of Woodruff and the robbery office's standard operating procedures. (Sergeant Rosario 4/18/2011 Suppression Hr'g 53, ECF No. 98.) Woodruff attacks Sergeant Rosario for refreshing his recollection based on a report he wrote during Woodruff's Third Interrogation. Courts have traditionally allowed witnesses to refresh their recollection; indeed, the Federal Rules of Evidence explicitly provide for it. *See* Fed.R.Evid. 612 (allowing a witness to refresh his recollection based on any document provided to him) & Fed. R.Evid. 803(5) (allowing a witness to testify and read from a memorandum or record "made or adopted by the witness when the matter was fresh in the witness' memory and [ ] reflect[ing] that knowledge correctly.") Woodruff does not argue that the report on which Sergeant Rosario relied was inaccurate or unreliable. Sergeant Rosario testified, and Woodruff does not dispute, that the record was sufficiently detailed to document "the times that [Woodruff] was offered water or restroom breaks" during the Third Interrogation. (Sergeant Rosario, 4/11/2011 Suppression Hr'g 64, ECF No. 98.)

Sergeant Rosario is an officer with the Memphis Police Department who handles a significant case load. (*Id.* 73:17–21.) More is required than his reliance on his records to "substitute our judgment for the credibility determination of the magistrate judge." *Moss,* 286 F.3d at 868.

Woodruff's argument that he was not properly given Miranda warnings before his Third Statement is also unavailing. (Second Objection 4–5.) The Magistrate Judge found that Sergeant Rosario reminded Woodruff that his *Miranda* rights were still in effect, and Woodruff does not

contest this. (Second Report 8.) Sergeant Rosario testified that he "reminded [Woodruff] of [his Miranda] rights verbally and advised him that [they] still applied" (Sergeant Rosario, 4/18/2011 Suppression Hr'g 63.) The Supreme Court has never "dictated the words in which the essential information [*Miranda* requires] must be conveyed." *Florida v. Powell,* — U.S. ——, 130 S.Ct. 1195, 1204, 175 L.Ed.2d 1009 (2010). Sergeant Rosario's statement to Woodruff that his *Miranda* rights still applied reasonably conveyed to Woodruff "his rights as required by *Miranda.*" *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (internal quotation omitted). Woodruff does not contend that he invoked his right to remain silent after the Second Interrogation. There was no violation of his constitutional rights.

### D. The Admissibility of Woodruff's Statements

▮▮▮ The Magistrate Judge concluded that Woodruff's First Statement, that he found the Hispanic IDs in his car, was excludible because it was "undisputed that Woodruff was in custody at the time." (Second Report 12.) Recognizing that "it is a close call," the Magistrate Judge held that "the officers' questions could be construed as reasonably likely to elicit incriminating information and therefore could be construed as interrogation." (*Id.* 12.) The Government contends that the Detectives merely conducted a reasonable inquiry (Govt. Resp. 9), but it does not dispute that Woodruff was under arrest when questioned. The Supreme Court has explicitly held that custodial interrogations occur when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d

714 (1977) (internal quotations omitted). To qualify as an interrogation, a statement must be reasonably likely to elicit incriminating information. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Not every question police officers ask will constitute an interrogation, but any "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response" amount to interrogation. *Id.* at 301–02, 100 S.Ct. 1682.

After Woodruff had been arrested, Detective Britton asked him how he had obtained the IDs. (Detective Britton, 3/24/2011 Suppression Hr'g 21.) That is not the sort of "casual conversation" that does not rise to the level of interrogation. *United States v. Thomas,* 381 Fed.Appx. 495, 502 (6th Cir.2010). Nor is it the sort of administrative concern, such as a defendant's name, address, height, or weight, that might permit questioning without a *Miranda* waiver. *United States v. Pacheco–Lopez,* 531 F.3d 420, 423 (6th Cir.2008). Detective Britton effectively asked Woodruff why he was carrying other people's IDs after arresting him for a previous robbery. Britton "should have known" his question "[was] reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 302, 100 S.Ct. 1682. Woodruff's First Statement is inadmissible because it was the product of a custodial interrogation without a *Miranda* warning.

Woodruff contends that the Second, Third, and Fourth Statements are inadmissible under *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

In *Elstad* and *Seibert* the Supreme Court considered the consequences of providing *Miranda* warnings after custodial interrogation had begun. In *Elstad,* officers interrogated the defendant without

informing him of his *Miranda* rights, and the defendant confessed to robbery. *Elstad*, 470 U.S. at 300–301, 105 S.Ct. 1285. Approximately one hour later, after the defendant had been transported to a police station, officers read him his *Miranda* rights and interrogated him again. *Id.* at 227, 105 S.Ct. 1285. The court decided that the first statement was inadmissible, but the second was admissible. *Id.* at 305–07, 105 S.Ct. 1285. The Supreme Court established a two-step test: whether the first, pre-*Miranda* statement was coerced, and if so, "whether that coercion has carried over into the second confession." *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285. When a statement is "unwarned but clearly voluntary . . . careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Id.* at 310–11, 105 S.Ct. 1285. The Supreme Court went on to hold that "subsequent administration of *Miranda* warnings should suffice" to cure the condition. *Id.* at 313, 105 S.Ct. 1285.

The Supreme Court clarified *Elstad* almost twenty years later in *Seibert.* The officers in *Seibert* intentionally refrained from informing the defendant about her *Miranda* rights, and, after persuading her to confess, read the *Miranda* warnings, had her sign a waiver of her rights, and resumed questioning immediately. 542 U.S. at 604–05, 124 S.Ct. 2601. Although the Supreme Court concluded that the police action was unconstitutional, the court divided 4–1–4, and there was no majority rationale. A plurality held that a court must use a five-factor test to determine whether subsequent, post-*Miranda*-warning statements are admissible:

1) The completeness and detail involved in the first round of questioning;

2) The overlapping content of the statements made before and after the warning;

3) The timing and setting of the interrogation;

4) The continuity of police personnel during the interrogations; and

5) The degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615, 124 S.Ct. 2601. Justice Kennedy concurred only in the result, opining that statements should not be excluded unless the police deliberately violated *Miranda. Id.* at 620, 124 S.Ct. 2601.

The Sixth Circuit has not explicitly adopted either Justice Kennedy's concurrence or the plurality's test. *See Pacheco-Lopez*, 531 F.3d at 427 n. 11 (refusing to "resolve this issue" because the interrogation at issue was inadmissible under both tests, but noting that most circuits have treated Justice Kennedy's concurrence as the controlling precedent).

### 1. The *Seibert* Plurality

Woodruff does not dispute that the Second Interrogation occurred after he had received a *Miranda* warning. (Second Objection 5.) He argues, however, that his Second, Third, and Fourth Statements are inadmissible under *Seibert* and *Elstad.*

█ The Second Statement is clearly admissible under the *Seibert* plurality. After his arrest, in the First Interrogation, Woodruff was asked only one question, how he had obtained the IDs. He made his First Statement then. He was not coerced, the First Interrogation was not detailed, and the only content that overlaps the First and Second Statements is Woodruff's statement that he found the IDs in his girlfriend's car and put them in his pocket. The First Statement was given outside Woodruff's car shortly after he was arrested; the Second Statement was

given three hours later at the police station. The Sixth Circuit has held that a time lapse of three hours is sufficient to insulate a subsequent statement. *Coomer v. Yukins*, 533 F.3d 477, 490 (6th Cir.2008). It has also held that moving a suspect from the site of his arrest to a police station is a sufficient break in continuity. *Id.* at 491. "Even under [ ] *Seibert's* plurality test, a reasonable person ... 'could have seen the station house questioning as a new and distinct experience'" (*id.* at 491) (quoting *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601), and "'the *Miranda* warnings [Woodruff received] could have made sense as presenting a genuine choice on whether to follow up on the earlier admission.'" *Id.* (quoting *Seibert*, 542 U.S. at 615–616, 124 S.Ct. 2601).

■ The two interrogations also addressed different subjects. The Second Interrogation focused on the handgun the police had found in the car. The First asked how Woodruff had obtained other individuals' IDs. The only *Seibert* factor weighing against the admissibility of the Second Statement is the continuity of police personnel. "[N]one of the facts ... indicates a police strategy adapted to undermine the *Miranda* warnings or indicates in any way that a reasonable person ... would not have understood his constitutional rights." *United States v. McConer*, 530 F.3d 484, 497 (6th Cir.2008). Woodruff's Second Statement is admissible under the plurality's test in *Seibert*. Because the *Miranda* warning before the Second Interrogation cured any *Miranda* defect, the Third and Fourth Statements are admissible as well. *See Elstad*, 470 U.S. at 318, 105 S.Ct. 1285 (holding that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given ... *Miranda* warnings."); *United States v.*

*Garreau*, 735 F.Supp.2d 1155, 1169–70 (S.Da.2010) (finding "subsequent statements" admissible when, "after being properly advised of his rights," the defendant's statements were voluntary). Once the police give a defendant in custody a *Miranda* warning, until the defendant invokes his right to remain silent or his right to counsel, police are free to interrogate him. *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "[O]nce [*Miranda* warnings are properly administered ... a defendant is left to make his own choice as to how to best proceed."] *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir.2011).

■ Although the *Miranda* warning Woodruff received before the Second Interrogation cleansed the subsequent Interrogations, the Third Statement is independently admissible. The factors the Supreme Court considered in *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601, would weigh in favor of admitting the Third Statement even if the *Miranda* warning preceding the Second Statement were not curative. The first round of questioning, by Detective Britton shortly after the arrest, was a single question. There was minor overlapping content. The officers at the scene asked how Woodruff had obtained Hispanic IDs. (Detective Britton, 3/24/2011 Hr'g 27.) Sergeant Rosario also asked about the IDs. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 64–67.) To the extent there was overlap, it is minimized by the fact that the Detectives asked a single question at the scene. *See United States v. Phillips*, No. 08–96–GFVT, 2008 U.S. Dist. LEXIS 111823, at *33–34 (E.D.Ky. Dec. 31, 2008) (finding no overlap because "prior interviews were short and cursory."). The timing and setting of the interrogations differed. The Third Interrogation took place at the police station fourteen hours after the First

Interrogation, not at the crime scene. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 65, 68–69.) The length of time and change of setting are sufficient to cure any taint. *Coomer,* 533 F.3d at 490–91. There was no continuity of police personnel between the First and Third Interrogations. The First Interrogation was conducted by Detective Britton and the Third by Sergeant Rosario. *Seibert,* 542 U.S. at 615, 124 S.Ct. 2601. The Third Interrogation was not continuous with the First. Sergeant Rosario relied on the Advice of Rights Form given to Woodruff during the Second Interrogation when Woodruff was at the police station; at no point did Rosario rely on the First Statement. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 68–69.) The factors considered by the plurality in *Seibert* weigh in favor of admissibility.

■ The Fourth Statement is also independently admissible given the *Seibert* factors. 542 U.S. at 615, 124 S.Ct. 2601. The First Interrogation was a single question. There was little overlap between the First and Fourth Interrogations. During the Fourth Interrogation, Woodruff confessed to participating in the robbery of several Hispanic individuals, using a firearm in the robbery, and seeking money to pay a debt for marijuana he had lost. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 68–73.) The content of the Fourth Statement significantly differs from the First Statement, in which woodruff was responding to a single question about how he had obtained the IDs. (Detective Britton, 3/24/2011 Suppression Hr'g 28.) The timing and setting were different. The Fourth Interrogation took place on April 7, two days after the First Interrogation and at the police station as opposed to the Kensington Apartments. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 65.) Sergeant Rosario, not Detective Britton,

conducted the Fourth Interrogation. (*Id.*) Rosario provided Woodruff with a separate statement of rights and did not treat the Fourth Interview as continuous with the First. (*Id.* 66.) The Fourth Statement is independently admissible.

Woodruff's final contention is that *Maryland v. Shatzer,* — U.S. ——, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), requires fourteen days between an initial interrogation and any subsequent interrogation to eliminate any coercive effect. Woodruff misconstrues *Shatzer,* which addressed how long police must refrain from interrogating a defendant who properly invoked his right to counsel and who had been released from custody. *Id.* at 1223. The Supreme Court in *Shatzer* addressed the possibility that "a suspect may be coerced or badgered into abandoning his earlier refusal to be questioned without counsel." *Id.* at 1220. The court reaffirmed that "*Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent ... [and] if the suspect indicates that he wishes to remain silent, the interrogation must cease." *Id.* at 1219. The court concluded that the right to remain silent does not last indefinitely. *Id.* "When ... a suspect has been released from his pretrial custody and has returned to his normal life ... there is little reason to think that his change of heart regarding interrogation has been coerced" because "[h]e has likely been able to seek advice from an attorney." *Id.* at 1221. *Shatzer* does not address the situation here, where an initial failure to provide a *Miranda* warning was followed by a subsequent warning and a second statement. The Supreme Court does not discuss or express any intent to overturn *Elstad* or *Seibert.* *Shatzer* does not control this case.

Woodruff never alleges that he invoked his right to counsel or to remain silent.

He was never released from custody. Any coercive effect of the First Interrogation was cured by the *Miranda* warning he was given before the Second Interrogation hours later in a different location and by subsequent warnings before subsequent interrogations. *See McConer*, 530 F.3d at 497. Woodruff's Statements are admissible under the plurality's test in *Seibert*.

## 2. Justice Kennedy's Analysis in *Seibert*

Justice Kennedy's concurrence in *Seibert* requires two steps. First, it directs the court to determine whether there was a deliberate violation of *Miranda*. *Seibert*, 542 U.S. at 622, 124 S.Ct. 2601. Second, if there was no deliberate violation, the court applies *Elstad* and decides whether statements made after a *Miranda* warning are admissible based on whether they were knowingly and voluntarily made. *Id.*

There is no evidence of a deliberate violation here. The Detectives asked Woodruff a single, natural question during the First Interrogation. They asked no further questions until Woodruff had received his *Miranda* warning. That contrasts with cases where the Sixth Circuit has found a deliberate violation of a defendant's *Miranda* rights. In *Dixon v. Houk*, for example, police officers "engaged in a thirty minute interrogation" before beginning to record a defendant. 627 F.3d 553, 557–58 (6th Cir.2010). The police also promised a "deal to avoid the death penalty in return for a confession . . . a high-pressure tactic designed to override" a defendant's commitment to his *Miranda* rights. *Id.* at 558.

In *Seibert*, Justice Kennedy found that an "unwarned interrogation . . . conducted in the station house," with "systematic, exhaustive [questions] managed with psychological skill" was a deliberate violation of *Miranda*. *Seibert*, 542 U.S. at 616, 124 S.Ct. 2601. The First Interrogation was

nothing like that. In contrast to *Seibert*, where "there was little, if anything of incriminating potential left unsaid," almost all of the evidence on which the Government relies here comes from the post-*Miranda* Interrogations. *Id.* If the police had deliberately intended to violate Woodruff's *Miranda* rights, they would have questioned him extensively. They did not. This case is more analogous to *McConer*, where the Sixth Circuit found that "a good-faith *Miranda* mistake," which was followed by giving the defendant a *Miranda* warning, did not violate his *Miranda* rights. *McConer*, 530 F.3d at 498.

Courts have identified several factors that indicate whether police deliberately withheld *Miranda* warnings. These include:

1) Whether the police department had an official policy of directing officers to withhold *Miranda* warnings;

2) Whether coercive or improper police tactics were used;

3) Whether there was a change in setting;

4) The lapse in time in questioning; and

5) The overlap in content between questioning.

*See United States v. Flack*, No. 3:08–CR–108, 2009 WL 5031320, at *15, 2009 U.S. Dist. LEXIS 116136, at *42–43 (E.D.Tenn. Dec. 11, 2009) (collecting authorities and identifying factors courts have used to determine whether the police had a deliberate policy). In the case at hand, there was a lapse in time, a change in setting, and little overlap in the content of questioning. Woodruff has also failed to offer evidence of police coercion or an official police policy of withholding *Miranda* warnings.

Under Justice Kennedy's analysis, a court should apply *Elstad* if there was no coercion or deliberate violation of a defen-

dant's *Miranda* rights. *Seibert,* 542 U.S. at 622, 124 S.Ct. 2601. Where, as here, a prior statement was "unwarned but clearly voluntary . . . careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Elstad,* 470 U.S. at 310–11, 105 S.Ct. 1285. Although this Court must "examine the surrounding circumstances" to determine whether Woodruff's post-*Miranda* statements were voluntary, "[t]he fact that a suspect chooses to speak after being informed of his rights is . . . highly probative." *Id.* at 318, 105 S.Ct. 1285.

*Coomer v. Yukins* demonstrates the difficulty of suppressing post-*Miranda* statements in the absence of coercion. 533 F.3d at 491. The defendant in *Coomer* confessed when nine to eleven police officers appeared at her apartment and talked to her before she had received a *Miranda* warning. Although the defendant's first statement was excluded, her second, given several hours later at the police station, was admissible because she had received "complete *Miranda* warnings and offered her second [statement] in different circumstances." *Id.* at 491.

Woodruff cites *Pacheco–Lopez* to support his Motion to Suppress, but the facts in *Pacheco–Lopez* are significantly different. 531 F.3d at 429. In *Pacheco–Lopez,* the defendant was interrogated immediately after being arrested, asked several questions, and then given his *Miranda* warning and interrogated further. *Id.* at 422–23. "There was no change in the time or place of the interrogation." *Id.* at 429. Those circumstances differ materially from this case, where Woodruff was interrogated several hours later on a different subject at a different location. *See Neal v. Booker,* No. 05–CV–74000, 2009 WL 1508285, at *9, 2009 U.S. Dist. LEXIS 45293, at *26 (E.D.Mich. May 29, 2009)

(admitting statements obtained, although there was an initial *Miranda* violation, when defendant was not threatened or abused, was permitted to use the bathroom, and time had passed between the first statement and the second, post-*Miranda* statement).

The *Miranda* warning before the Second Interrogation, given in a non-coercive atmosphere, to an individual who knowingly and voluntarily waived his rights, cured whatever defect flowed from the First Interrogation. All of the Statements after the *Miranda* warning are admissible because, until a defendant invokes his right to remain silent or his right to counsel, police are free to interrogate him. *Davis,* 512 U.S. at 458, 114 S.Ct. 2350. As Justice Kennedy recognized, "it would be extravagance to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning." *Seibert,* 542 U.S. at 620, 124 S.Ct. 2601.

The Third and Fourth Statements are independently admissible as well. Sergeant Rosario reminded Woodruff that the *Miranda* warning he had received before the Second Interrogation was still in effect. (Sergeant Rosario, 4/18/2011 Suppression Hr'g 68–69.) Woodruff was advised of his rights and given an Advice of Rights Form before the Fourth Interrogation. (Sergeant Rosario, 3/24/2011 Suppression Hr'g 65.) There is no indication that his Statements were solicited as part of a deliberate plan to violate *Miranda;* rather, Sergeant Rosario's actions demonstrate scrupulous respect for Woodruff's *Miranda* rights. Woodruff's Third and Fourth Statements are admissible under Justice Kennedy's analysis.

## IV. Conclusion

For the foregoing reasons, Woodruff's objections are not well taken. The Court

ADOPTS the Reports and Recommendations of the Magistrate Judge and DENIES the Motions to Suppress. All findings and conclusions of the Magistrate Judge not discussed above have not been specifically objected to and are ADOPTED.

So ordered.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

DIANE K. VESCOVO, United States Magistrate Judge.

The defendant, Preston Woodruff, has been charged in a one-count indictment with possessing a gun as a convicted felon on April 5, 2009 in violation of 18 U.S.C. § 922(g). Before the court is the September 9, 2010 motion of Woodruff to suppress all oral and written statements made by him at the scene of his arrest or while in formal custody as being obtained in violation of his *Miranda* rights. The government filed a timely response in opposition. The motion was referred to the United States Magistrate Judge for report and recommendation.

Woodruff filed an earlier suppression motion seeking to exclude all evidence, including statements, obtained by law enforcement officers in violation of his Fourth Amendment rights. The court held an evidentiary hearing on that motion and subsequently recommended in a Report and Recommendation filed May 13, 2010 that the motion to suppress be denied. On July 9, 2010, Woodruff timely filed objections to the factual findings and legal conclusions set forth in the May 13, 2010 Report and Recommendation. Subsequently, Woodruff filed the present motion to suppress. By order dated December 20, 2010, the district judge deferred ruling on Woodruff's objections until a report and recommendation is submitted and objections, if any, are filed with respect to the present motion.

A limited evidentiary hearing was held on March 24, 2011 to receive any additional evidence related to the present motion to suppress. At that hearing, the government called two witnesses with the Memphis Police Department ("MPD"): (1) Detective Michael Britton with the Organized Crime Unit ("OCU") and (2) Sergeant Michael Rosario with the Robbery Squad. The defense did not call any witnesses to testify. The parties introduced a total of three exhibits into evidence: (1) Statement of Woodruff taken by Detective Britton on April 7, 2009 (Ex. 1); (2) MPD Arrest Record (Ex. 2); and (3) Advice of Rights Form and Statement of Woodruff, taken by Detective Rosario on April 7, 2009 (Ex. 3). On the defendant's motion, the March 24, 2011 hearing was continued in order for Woodruff to introduce any supplemental evidence.

On April 18, 2011, the court re-opened the proof to receive additional evidence regarding the present motion to suppress. The defense called two additional witnesses: (1) Lieutenant Debra Oliver–Hammons, the record-keeper at the Shelby County Jail; and (2) Lieutenant Paul Wright, Jr. with OCU. The government called Detective Britton and Sergeant Rosario back to the stand to testify. The parties introduced five additional exhibits: (1) the Detective Check Out Log from the Shelby County Jail (Ex. 4); (2) seven pages from the Shelby County Jail Log Book (Ex. 5); (3) Detective Rosario's Robbery Supplement (Ex. 6); (4) the April 5, 2009 Advice of Rights Form (Ex. 7); and (5) the April 5, 2009 Robbery Supplement (Ex. 8).

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the

entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## I. PROPOSED FINDINGS OF FACT

### A. *Woodruff's First and Second Statements*

The court adopts and incorporates herein its previous proposed Findings of Fact. As previously found:

On the evening of April 4, 2009 and the early morning hours of April 5, 2009, Detectives Michael Britton ("Detective Britton") and Billy Jackson ("Detective Jackson") (collectively "the detectives") were patrolling the area near the intersection of Comanche and Getwell roads in Memphis. The government's first witness, Detective Britton, testified that at the time of the arrest the area surrounding the intersection was considered a "hot spot" for robberies of Hispanics, particularly at night.

\* \* \*

Detective Britton testified that between approximately 11:00 p.m. and 12:00 a.m. that evening, the detectives were stopped at the light facing southbound on Getwell at its intersection with Comanche and saw the defendant Woodruff headed northbound on Getwell in a black 2003 Chevrolet Monte Carlo.

\* \* \*

[A]fter witnessing Woodruff run the red light, the detectives activated their blue lights and effectuated a traffic stop of Woodruff's vehicle in the entrance to the apartment complex. Due to his knowledge of the surrounding area and his observation of the vehicle's occupants' movements, Detective Britton wasted little time exiting his cruiser and approaching the driver's side of the vehicle. Detective Britton ... asked the driver for identification, which he then scanned using his police-issued PDA device.

The scan revealed an outstanding warrant for Woodruff's arrest for aggravated robbery. The detectives immediately placed Woodruff under arrest upon learning of the warrant, patted him down, and placed him in the squad car. During the pat down of Woodruff, the detectives discovered three identification cards picturing Hispanic individuals and a social security card for an unidentified forth [sic] person.... [W]hen [Detective Britton] asked Woodruff how he obtained identification cards, Woodruff explained that he found them in his vehicle.[1]

\* \* \*

The detectives then conducted a search of Woodruff's vehicle incident to his arrest. Underneath the passenger's seat, the detectives found a loaded chrome Lorcin L25, .25 caliber semiautomatic handgun with six (6) brass

---

**1.** Specifically, Officer Britton testified as follows:

Q. Okay. Now when you found the IDS in Mr. Woodruff's pocket-

A. Yes, ma'am.

Q. —could you indicate what type of individuals or what nationality or race of individuals were depicted on these cards?

A. They were Hispanics.

Q. "Okay. Did you say anything about that fact"

A. I asked him whose Ids these were and why did you have them. He advised me that he found them on the seat of his car and he just put them in his pocket.

Q. Okay. So he said he found them in the car.

A. Yes, ma'am.

Q. Did you interpret that he meant the car that he just got out of?

A. Yes, ma'am.

(Tr. Pp. 21–22.)

Winchester rounds in the clip and one (1) in the chamber. In addition to the handgun, the detectives also found a maroon ski mask with holes cut into it and a Tennessee Lottery baseball cap with red Jamaican braids attached to it near the center console, four (4) cell phones in the trunk, and, various documents and pictures of Woodruff and Fulford throughout the passenger compartment of the vehicle. According to the MPD Towed/Recovered Report (Ex. 4), the Monte Carlo was towed to the vehicle impound lot at approximately 1:40 a.m.

[T]he detectives transferred both men to the MPD office located on Channel 3 Drive. Woodruff and Fulford were read their *Miranda* rights and both chose to give a statement to police. In his statement, Woodruff claimed to have found the handgun in the center console of his vehicle while driving and then placed it under the passenger seat.

The next witness, Sergeant Michael Rosario ("Sgt. Rosario"), testified that at the time of Woodruff's arrest, he was serving as an officer in the MPD's Robbery division. Sgt. Rosario stated that the crime data available to the police at the time of the arrest showed that the area around the Kensington Manor Apartments was a hot spot for robberies of Hispanics and that the detectives patrol team had been deployed there on account of this information.

The court finds the testimony of the detectives to be credible and accepts their version of the events as fact.

(D.E. No. 47 at 3–5.) The statement made by Woodruff at the scene of the arrest will be referred to as "the first statement."

In addition, the court finds the testimony of all witnesses offered in the evidentiary hearing on March 24, 2011 and April 18, 2011 to be credible and accepts their version of the events as facts. In the hearing

conducted on April 18, 2011, Detective Britton and Sergeant Rosario testified consistently with their previous testimony given on March 24, 2011 and provided additional information regarding Woodruff's statements.

Detective Britton testified that the events leading up to the arrest of Woodruff began about 11:55 p.m. on Saturday, April 4, 2009 and that he would have patted down and questioned Woodruff about the Hispanic identification cards within ten minutes of the stop and arrest of Woodruff that night. Following Woodruff's arrest, Britton and Jackson transported Woodruff to the OCU office between 2:00 a.m. and 3:00 a.m., Sunday morning, April 5, 2009. Detective Britton also testified that Lieutenant Paul Wright made the scene of the arrest before Woodruff and Fulford were transferred to the OCU office on Channel 3 Drive.

At the OCU office, Lieutenant Wright informed the officers that he had previously dealt with Woodruff and Fulford regarding a 2005 robbery, that their nicknames were Dinosaur and Gorilla, and that they were involved in robberies of Hispanics. Woodruff was placed in an interview room and detained by leg shackles. Detective Britton testified that he advised Woodruff of his *Miranda* rights orally and in writing and briefly questioned him before he began typing out Woodruff's statement at 3:55 a.m., Sunday morning, April 5, 2009. This statement will be referred to as "the second statement." Woodruff's second statement consists of three typed pages and provides that it is "relative to the weapons violation complaint filed against Woodruff." (Ex. 1.) The second statement consists of twenty-eight separate questions. (*Id.*) The questions primarily concerned the handgun and other belongings found in the Monte Carlo that Woodruff was driving. (*Id.*) Detective

Britton asked Woodruff one question about the identification cards: "Why were the identification cards of Daniel Jimmenez Juan San Rafael [sic], Victor Garcia, and Roberto Adorno found in you [sic] pocket?" (*Id.*) In response, Woodruff stated "They were on [ sic] driver seat so I picked them up and put them in my pocket." (*Id.*) Woodruff also stated that his girlfriend, Celestine Evans, owned the Monte Carlo he was driving. (*Id.*)

### B. *Woodruff's Third Statement*

The government's second witness, Sergeant Rosario, was assigned to the Robbery squad at the time in question and was the lead investigator for robberies of Hispanics. Sergeant Rosario testified that he arrived at work on Sunday, April 5, 2009 at 8 a.m. and read an email sent from Lieutenant Wright at 8:12 a.m. The email stated that Woodruff had been arrested and found in possession of Hispanic identification cards. Lieutenant Wright also informed Sergeant Rosario that Woodruff worked on a two-man team with Fulford and that they were known for robbing Hispanics. Sergeant Rosario ran a robbery report, but no report regarding the robbery of Hispanic victims was located.[2]

According to his Robbery Supplement, Sergeant Rosario called the jail at 201 Poplar at approximately 12:53 p.m. that afternoon, Sunday, April 5, 2009, for a detective's visit with Woodruff. (Ex. 8.) At 1:30 p.m., Sergeant Rosario and Sergeant Winston transferred Woodruff from the jail to the Robbery Office located on the 11th floor at 201 Poplar. (*Id.*) Woodruff declined something to drink and advised the officers that he had been served lunch. (*Id.*) Sergeant Rosario testified that he reminded Woodruff that he had

been advised of his rights earlier that morning by Detective Britton and advised Woodruff that the rules still applied. Sergeant Rosario then conducted a broad questioning of Woodruff, advising Woodruff that they were interested in any information on robberies that he may or may not have been involved in.

According to Sergeant Rosario, Woodruff stated that he was on supervised federal release and provided the name of a known robber, Tony Bone. (Ex. 8.) Woodruff also provided information regarding the murder of a male known as Geno. (*Id.*) Woodruff stated that he was driving his girlfriend's vehicle when he was pulled over on April 4, 2009 and denied any involvement in a robbery. (*Id.*) He also informed Sergeant Rosario that the checkmaking materials found in the car were from an arrest made years ago. (*Id.*) Woodruff stated that he was given the Hispanic identifications from a darkskinned female named Rolanda, whom he had met through Nicole Merden. (*Id.*) Sergeant Rosario showed Woodruff a picture of Rolanda Garrett, and Woodruff identified her as the individual that gave him the identification cards. (*Id.*) According to the jail check out log and Sergeant Rosario's Robbery Supplement, Woodruff was signed back into the jail at 5:25 p.m. that evening with "no visible injuries." (Ex. 4 & 8.) Woodruff's oral statement, given between 1:30 p.m. to 5:25 p.m. on Sunday afternoon April 5th, will be referred to as "the third statement."

### C. *Woodruff's Fourth Statement*

Sergeant Rosario further testified that during roll call the next day, Monday, April 6, 2009 at 8:00 a.m., he was assigned

---

**2.** According to Sergeant Rosario, some officers take handwritten reports, which take longer to enter the system than those taken on PDAs. The robbery report of stolen Hispanic identification cards had not yet entered the system when he checked on April 5, 2009.

a case involving a robbery of Hispanics.[3] The Hispanic victims were the same individuals whose identification cards had been found on Woodruff. On Tuesday, April 7th, between 9:59 a.m. and 3:15 p.m., Sergeant Rosario met with the victims and showed them a photo lineup. Woodruff was positively identified.

Later on Tuesday, April 7th, Sergeant Rosario called for another detective's visit with Woodruff. Woodruff was transported from the jail to the Robbery Office, detained in an interview room, and provided with an Advice of Rights form. Woodruff was orally advised his *Miranda* rights, and he signed the Advice of Rights Form at 5:16 p.m., indicating that he wished to make a statement. (Ex. 3.) Sergeant Rosario conducted a brief question and answer session with Woodruff before he began typing Woodruff's statement at 6:04 p.m. Woodruff's four-page statement states it is "relative to the Robbery Complaint filed by Juan Candelaria which occurred at 6015 Littlebrook Circle North # 112 on April 4, 2009." (*Id.*) In his statement, Woodruff admitted to participating in the robbery of Juan Candelaria and other Hispanics on April 4, 2009, at approximately 11:05 p.m. (*Id.*) Woodruff stated that he was armed with a small caliber chrome gun which he got of the car he was driving and that the car belonged to his girlfriend, Celestine Evans. (*Id.*) When asked what was taken in the robbery, Woodruff replied that he took some identification cards and put them in his pocket. (*Id.*) Woodruff read his statement and signed it at 6:43 p.m. (*Id.*) This statement will be referred to as "the fourth statement."

On Wednesday, April 8, 2009, Sergeant Rosario called the jail at 12:10 p.m. for a detective's visit. (Ex. 5.) At 12:50 p.m., Sergeant Rosario called again. (*Id.*) However, due to a code change at the jail, Sergeant Rosario did not visit with Woodruff. (*Id.*) Woodruff was transferred within the jail to have his fingerprints taken at 5:30 p.m. by Sergeant Bobby Jones. (Ex. 4.)

## II. PROPOSED CONCLUSIONS OF LAW

In the present motion, Woodruff's sole ground upon which he seeks to suppress his statements is the lack of *Miranda* warnings prior to his first statement at the scene of the arrest.[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Woodruff argues that because the first statement was obtained in violation of *Miranda*, all subsequent statements are tainted, even those made with *Miranda* warnings.

*Miranda* requires that before a person in custody is questioned, he be advised of his Fifth Amendment right to remain silent, that anything he says may be used against him, and that he has a right to have an attorney, either retained or appointed, present during interrogations. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. If the defendant is not informed of these rights, any pretrial statement obtained in a custodial interrogation is presumed coerced and inadmissible at trial in the government's case in chief. *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

 The clear rule is that "[w]hen police ask questions of a suspect in custody

---

3. The robbery report had now been entered into the system, and Sergeant Rosario started his case file on Woodruff.

4. In his earlier motion, Woodruff also sought suppression of the statements as fruits of the poisonous tree from an alleged Fourth Amendment violation which this court has recommended denying.

without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad,* 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The "right" to *Miranda* warnings is not constitutionally mandated. *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). Rather, the warnings are intended as a prophylactic mechanism to safeguard against the inherently coercive effects of in-custody interrogation which threaten the Fifth Amendment privilege. *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

■ *Miranda* warnings are required only when a suspect is in custody and subject to interrogation. *Miranda* defined custody as the "[deprivation] of ... freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. "Interrogation" means "express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

It is undisputed that Woodruff was in custody at the time he made the first statement regarding the identification cards found in the automobile he was driving. The officers asked Woodruff whose identification cards they were and why he had them. Woodruff answered that he found them on the seat of his car and put them in his pocket. Although it is a close call, the officers' questions could be construed as reasonably likely to elicit incriminating information and therefore could be construed as interrogation. It is undisputed that no *Miranda* warning had been provided to Woodruff at the time. It is also undisputed, however, that Woodruff's response was not incriminating and was not a confession because Woodruff lied to the officers about where he got the identi-fication cards. Nevertheless, the first statement is inadmissible.

The critical issue is whether Woodruff's subsequent statements are therefore rendered tainted by the first unwarned statement. Woodruff argues that two Supreme Court decisions, *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) and *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), mandate that the three post-*Miranda* statements should be suppressed.

In *Elstad,* the Supreme Court, in refusing to exclude a second post-*Miranda* statement even though the initial pre-*Miranda* statement was inadmissible, held that "absent deliberately coercive or improper tactics in obtaining the initial statement," a post-*Miranda* statement was not automatically excluded. *Elstad,* 470 U.S. at 314, 105 S.Ct. 1285. Rather, the Supreme Court instructed lower courts to "examine the surrounding circumstance and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.* at 318, 105 S.Ct. 1285.

The Supreme Court revisited *Elstad* nine years later in *Seibert. Seibert* was a plurality decision in which Justice Kennedy filed an opinion concurring in the judgment that the defendant's statements should be suppressed. 542 U.S. 600, 124 S.Ct. 2601. In *Seibert,* the police interrogated the defendant for 30 to 40 minutes, obtained a confession, took a 20 minute break, returned and gave *Miranda* warnings, and then continued to question the defendant about her pre-*Miranda* statements to get her to repeat the confession. *Id.* at 604–05, 124 S.Ct. 2601. The Court held that the mid-interrogation warning did not comply with *Miranda's* constitutional warning requirement because the interrogation was nearly continuous and the warnings were intentionally withheld

in order to procure a confession. *Id.* at 617, 124 S.Ct. 2601.

The *Seibert* plurality developed the following five factor test to determine whether giving a *Miranda* warning mid-interrogation would be effective: (1) the completeness and detail involved in the first round of interrogation; (2) the overlapping content of the statements made before and after the warning; (3) the timing and setting of the interrogations; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615, 124 S.Ct. 2601. Justice Kennedy, however, rejected the plurality's test and concluded that a mid-interrogation warning is not effective if the police deliberately evade *Miranda* and do not take curative measures. *Id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). If the police are not deliberately attempting to evade *Miranda*, then Justice Kennedy stated that the voluntariness test of *Elstad* applies. *Id.*

Because the Supreme Court divided 4–1–4 in *Seibert*, there is confusion over whether the plurality or Justice Kennedy's opinion controls. The Sixth Circuit has analyzed cases under both tests. *See United States v. Pacheco–Lopez*, 531 F.3d 420, 427 n. 11 (6th Cir.2008). Woodruff contends that it is unnecessary for this court to decide which test controls because the post-*Miranda* statements are inadmissable under all three tests: *Seibert's* plurality test, *Seibert's* concurrence, and the *Elstad* test. The government argues that an analysis of the facts under these tests indicate that the post-*Miranda* statements are admissible. The court will look at all three tests when determining whether Woodruff's subsequent statements should be suppressed.

## A. *Admissibility of Woodruff's Second Statement*

Woodruff's second statement was taken by Detective Britton at the OCU office located on Channel 3 Drive at 3:55 a.m. on Sunday, April 5, 2009, approximately three to four hours after his first statement was given. *Miranda* warnings were administered immediately before his second statement was made.

Under *Seibert's* plurality test, four of the five factors weigh in favor of admissibility of Woodruff's second statement. The first factor, the completeness and detail involved in the first round of interrogation, weighs in favor of admissibility because the initial question, i.e. the first statement, consisted only of asking Woodruff "whose IDs these were and why did [he] have them." When Woodruff replied that he found them in the car and put them in his pocket, the officers did not pursue any additional questions about the identification cards. Thus, Woodruff provided very little detail and the interrogation was very limited.

The second factor, the overlapping content of the pre-*Miranda* statements and post-*Miranda* statements, also weighs in favor of admissibility. The only overlapping content in Woodruff's first statement at the scene of his arrest and his second statement at the OCU office on Channel 3 Drive was that he found the identification cards in his girlfriend's car and put them in his pocket. During the first statement at the arrest scene, Woodruff was not asked about the gun. The officers had not even found the gun when they asked Woodruff about the identification cards found in his pocket. The majority of Woodruff's second statement consisted of Woodruff informing the officers about the handgun. There was only one question and response related to the identification cards.

As to the third factor, the timing and setting of Woodruff's statements differed drastically. Woodruff's first statement was taken at the apartment complex, a little after midnight on Sunday morning, April 5, 2009. At least three hours later, Woodruff made the second statement at the OCU office on Channel 3 Drive.

The fifth factor, the continuity of questioning, also weighs in favor of admissibility. At the scene of the arrest, the officers did not ask Woodruff about the gun and asked only one question about the identification cards. The main focus of the officers questions in the second round was the handgun that they found on Woodruff. Plus, several hours had passed between the first question at the scene and the later questioning at the OCU office. Thus, the second round of questioning cannot be viewed as a continuation of the first question.

The fourth factor, the continuity of police personnel, is the only factor that weighs against admissibility. Woodruff gave his first and second statements to the same police officers, Detectives Britton and Jackson.

Four of the five *Seibert* factors demonstrate that *Miranda* warnings were effective. As a result, the court finds that Woodruff's second post-*Miranda* statement is admissible under *Seibert's* plurality test.

Under *Seibert's* concurrence, whether Woodruff's post-*Miranda* statements are admissible depends on whether the officers deliberately evaded *Miranda* and took no curative measures. The defense argues that the fact officers were a special unit, investigating Hispanic robberies, indicates that the question about the identification cards without *Miranda* warnings was deliberate. The court disagrees. Just after asking Woodruff for identification, the officers found Woodruff in possession of iden-tification cards that were clearly not his. Questioning whose identification cards they were and where he got them is logical. While this question may have elicited incriminating evidence, the court does not believe the officers engaged in a deliberate strategy to get Woodruff to confess to everything he knew about the robbery of Hispanics. If this were the officers' intent, they would have asked Woodruff additional follow-up questions. Instead, the officers waited over three hours, transported Woodruff to a new location, read him his rights, and then asked him the same question again about the identification cards. Again, the officers did not ask any additional questions about the cards. Because the court finds that the officers were not deliberately evading *Miranda*, Kennedy's concurrence directs the court to apply the voluntariness test of *Elstad*.

Under *Elstad*, the Supreme Court instructed lower courts to "examine the surrounding circumstance and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Here, the detectives immediately placed Woodruff under arrest upon learning that Woodruff had an outstanding warrant for aggravated robbery. The officers patted him down, and they placed him in the squad car. During the pat down, the detectives discovered the identification cards and asked about them. There is no evidence that the officers coerced Woodruff into confessing. In fact, Woodruff did not confess that he had robbed Hispanics of their identification cards; Woodruff only told the officers that he found the identification cards in his girlfriend's car and put them in his pocket. When the officers asked him again about the IDs at OCU, Woodruff gave the same answer. Although Woodruff was detained, he was given restroom breaks and there was no evidence that the officers threat-

ened him. Viewing the surrounding circumstances and the entire course of the police conduct, the court finds that Woodruff's second statement is admissible under the *Elstad* test.

Accordingly, regardless of whether the *Seibert* plurality or concurring opinion controls, the court finds that the mid-interrogation *Miranda* warning was effective, and the second statement is admissible.

## B. *Admissibility of Woodruff's Third Statement*

Woodruff made the third statement to Sergeant Rosario on Sunday, April 5, 2009, at 1:30 p.m., more than nine hours after the second statement was made. Woodruff did not sign a waiver of rights form before giving his third statement; however, Sergeant Rosario reminded Woodruff that he had been advised of his rights earlier that morning by Detective Britton and advised him that the rules still applied.

Under the *Seibert* plurality test, the court finds at least three factors weigh in the favor of admissibility and therefore Sergeant Rosario's oral reminder of Woodruff's *Miranda* rights was effective.

The first factor, the completeness and detail involved in the first round of interrogation, weighs in favor of admissibility. As previously stated, the first statement consisted of only question about the identification cards. While the second statement consisted of twenty-eight separate questions, the questions primarily concerned the handgun and other belongings found in the Monte Carlo that Woodruff was driving. The officers only asked one question about the Hispanic identification cards.

The second factor weighs partially against admissibility. There was little overlapping content of the second and third statements but there was some overlap between the first and third statement. As stated above, the majority of Woodruff's second statement consisted of Woodruff informing the officers about the handgun, and there was only one question and response related to the identification cards in which Woodruff told the officers he found in the car and put them in his pocket. In his third statement, Woodruff told Sergeant Rosario that he had no involvement in the robberies, did not mention anything about a firearm, and stated that he received the Hispanic identification cards from a female named Rolanda. Woodruff also provided Sergeant Rosario with information regarding other people's criminal activities. However, because the first statement was so limited, there is very limited overlap between the first and third statements.

The third factor also weighs in favor of admissibility. The third statement was taken over nine hours after the second statement and over fourteen hours after the first statement. Additionally, the setting of the statements changed. The first statement was taken at the scene of the arrest, the second statement was taken at the OCU office on Channel 3 Drive, and the third statement was taken at the Robbery Office located at 201 Poplar.

The fourth factor is satisfied because there was no continuity of police personnel. Detective Britton and Lieutenant Wilson took Woodruff's first and second statement while Sergeant Rosario took the third statement.

Finally, the fifth factor, the degree to which the interrogator's questions treated the second round as continuous with the first, partially weighs against admissibility. During the third interrogation, Sergeant Rosario did not provide Woodruff with an additional Advice of Rights form. Sergeant Rosario testified that he reminded Woodruff that he'd been advised of his

*Miranda* rights earlier that morning and advised him that the rule still applied. Although he relied on the previous Advice of Rights form, Sergeant Rosario testified, however, that the third interrogation was not part of the ongoing traffic stop investigation.

Three out of the five *Seibert* factors demonstrate that *Miranda* warnings were effective. As a result, the court finds that Woodruff's third post-*Miranda* statement is admissible under *Seibert's* plurality test.

Under *Seibert's* concurrence, the inquiry turns on whether the officers deliberately evaded *Miranda* and took no curative measures during Woodruff's third interrogation. There is no evidence that Sergeant Rosario was involved in a plan or scheme to get Woodruff to confess. Sergeant Rosario had nothing to do with the first or second statements. The third statement took place approximately nine hours after Woodruff made his second statement. Although Sergeant Rosario did not have Woodruff sign another Advice of Rights form, he clearly reminded Woodruff of his rights and told him that the rules still applied while he was questioning him. As such, the court finds that Sergeant Rosario was not deliberately evading *Miranda* and thus the court will turn to the *Elstad* voluntariness test.

The court comes to the same conclusion under the *Elstad* test. There is no evidence that the police coerced Woodruff into making confessions. As stated above, the officers merely asked Woodruff a logical question after finding Hispanic IDs on him. They immediately stopped their questioning and did not resume until several hours later, after Woodruff was orally advised of his rights and given an Advice of Rights form. Further, Sergeant Rosario repeated his rights as soon as he sat down with Woodruff.

Accordingly, the court finds that Woodruff's third statement is admissible.

C. *Admissibility of Woodruff's Fourth Statement*

Woodruff made his fourth statement to Sergeant Rosario on April 7, 2009, at approximately 6 p.m. in the Robbery Office at 201 Poplar. Immediately before typing the fourth statement, Woodruff signed an Advice of Rights form. The fourth statement was made over two and half days after his initial pre-*Miranda* statement was made and over two days after his third post-*Miranda* statement was made. In his fourth statement, Woodruff admitted to the robbery.

Under the *Seibert* plurality test, the court finds that the mid-interrogation *Miranda* warnings were effective. Although Sergeant Rosario was detailed in his questioning of Woodruff during the third interrogation, Woodruff did not actually "let the cat out of the bag" until over two days later at the fourth interrogation. There is no overlapping content of the statements that Woodruff made before and after the *Miranda* warnings. Woodruff initially stated that he found the identification cards on the seat of the car and then changed his story in his third statement to say that he received the identification cards from a female named Rolanda. In his fourth statement, Woodruff confessed to robbing Juan Candelaria and other Hispanics. He also admitted to carrying a firearm and taking the identification cards from Hispanics. Although Sergeant Rosario conducted both the third and fourth interrogations at the same location, the court finds that the timing of the interrogations weighs heavily in favor of admissibility and that Sergeant Rosario did not treat the fourth round as continuous with the third. The third statement was taken on April 5th at 1:30 p.m. Sergeant Rosar-

io did not question Woodruff again until two days later on April 7th at 6 p.m., after Woodruff was read his *Miranda* rights again and received an Advice of Rights form. As such, the court finds that Woodruff's fourth statement is admissible under *Seibert's* plurality.

Whether Woodruff's fourth statement is admissible under *Seibert's* concurrence depends on whether the officers deliberately evaded *Miranda* and took no curative measures. The court is not persuaded that the officers were involved in a scheme to intentionally evade *Miranda*. Woodruff was read his *Miranda* rights on three different occasions and was provided with two separate Advise of Rights forms. The officers allowed time to pass between each interrogation, they did not question Woodruff extensively, they reminded Woodruff of his rights each time, and they changed up the subject of the interrogations. Because the court finds that the officers were not deliberately evading *Miranda*, the court will apply the voluntariness test of *Elstad*.

Viewing the entire course of police conduct, from the first interrogation to the fourth, the court finds that Woodruff's statements were voluntarily made. The court has already determined that the second and third statements were made voluntarily. Woodruff made no allegations that Sergeant Rosario threatened him during the fourth interrogation. In fact, Sergeant Rosario testified that Woodruff freely explained that "times were hard" and that he participated in the robbery because he needed money to pay a drug debt. Woodruff was only questioned for a short period of time during the fourth interrogation. Woodruff signed the Advice of Rights form at 5:14 p.m. and signed his written statement at 6:43 p.m., indicating that the questioning was over.

Accordingly, the court finds that the mid-interrogation *Miranda* warning was effective, and Woodruff's fourth statement is admissible.

## III. RECOMMENDATION

For the reasons expressed above, it is recommended that Woodruff's motion to suppress be denied in part and granted in part. The court recommends that Woodruff's motion to suppress the first statement be granted, and the motion to suppress all subsequent statements made at the OCU office on Channel 3 Drive and at the Robbery Office at 201 Poplar be denied.

Respectfully submitted this 20th day of June, 2011.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

Before the court is the January 21, 2010 motion of the defendant, Preston Woodruff ("Woodruff"), to suppress all physical evidence, statements, or admissions obtained by law enforcement officers resulting either directly or indirectly from a traffic stop conducted on April 5, 2009, at the Kensington Manor Apartments near the intersection of Comanche and Getwell in Memphis, Tennessee, 38118. The government filed a timely response in opposition. The motion was referred to the United States Magistrate Judge for report and recommendation.

The court held and evidentiary hearing on May 4, 2010. At that hearing, the government called three witnesses, all of the Memphis Police Department ("MPD"): Detective Michael Britton, Detective Billy Jackson, and Sgt. Michael Rosario. The government also produced two exhibits: (1) A report from the Tennessee Department of Safety certifying that on the date of the search, the driving privileges of

Cory Lee Fulford had been revoked ("Ex. 1"); and (2) the MPD's Tow–In Policy in effect at the time of the arrest ("Ex. 2"). The defendant testified on his own behalf and called one additional witness, Celestine Evans. The defendant also produced two exhibits: (1) Detective Britton's arrest ticket ("Ex. 3"); and (2) the MPD's towing slip for Woodruff's vehicle. After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

## PROPOSED FINDINGS OF FACT

On the evening of April 4, 2009 and the early morning hours of April 5, 2009, Detectives Michael Britton ("Detective Britton") and Billy Jackson ("Detective Jackson") (collectively "the detectives") were patrolling the area near the intersection of Comanche and Getwell roads in Memphis. The government's first witness, Detective Britton, testified that at the time of the arrest the area surrounding the intersection was considered a "hot spot" for robberies of Hispanics, particularly at night. The detectives were patrolling in an unmarked, dark tan, Dodge Charger, equipped with interior blue lights and two exterior spotlights located at the front of the vehicle. The vehicle's windows were not tinted at that time.

Detective Britton testified that between approximately 11:00 p.m. and 12:00 a.m. that evening, the detectives were stopped at the light facing southbound on Getwell at its intersection with Comanche and saw the defendant Woodruff headed northbound on Getwell in a black 2003 Chevrolet Monte Carlo. From their position, the officers observed Woodruff run a red light while making a left hand turn into the entrance of the Kensington Manor Apartment complex located at the west end of Comanche Road. Detective Britton testified that no other vehicles were in front of or behind Woodruff's vehicle as Woodruff entered the turning lane and made the illegal left hand turn.

After witnessing Woodruff run the red light, the detectives activated their blue lights and effectuated a traffic stop of Woodruff's vehicle in the entrance to the apartment complex. Detective Britton testified that Kensington Manor Apartment complex was surrounded by wrought iron fencing, except for a single entry way located at the west end of Comanche Road. The entry way to the apartment complex consisted of two parallel lanes, one for ingress and one for egress. The two lanes were separated by a keypad used to activate the entry way gate, however, no gates were present at the time of the traffic stop.

Detective Britton stated that during the traffic stop, he used his patrol car's spotlight to look through the back window of Woodruff's vehicle and saw both the driver and passenger making suspicious movements while leaning toward the middle of the vehicle. Due to his knowledge of the surrounding area and his observation of the vehicle's occupants' movements, Detective Britton wasted little time exiting his cruiser and approaching the driver's side of the vehicle. Detective Britton testified he asked the driver for identification, which he then scanned using his police-issued PDA device.

The scan revealed an outstanding warrant for Woodruff's arrest for aggravated robbery. The detectives immediately placed Woodruff under arrest upon learning of the warrant, patted him down, and placed him in the squad car. During the pat down of Woodruff, the detectives discovered three identification cards picturing

Hispanic individuals and a social security card for an unidentified forth person. Detective Britton testified that when he asked Woodruff how he obtained identification cards, Woodruff explained that he found them in his vehicle. Subsequent to Woodruff's arrest, Detective Jackson approached Woodruff's passenger, Cory Lee Fulford ("Fulford"), and asked for Fulford's identification. Detective Jackson then detained Fulford after a check of Fulford's identification revealed that he was on Federal Supervised Release.

Detective Britton testified that the detectives then conducted a search of Woodruff's vehicle incident to his arrest. Underneath the passenger's seat, the detectives found a loaded chrome Lorcin L25, .25 caliber semi-automatic handgun with six (6) brass Winchester rounds in the clip and one (1) in the chamber. In addition to the handgun, the detectives also found a maroon ski mask with holes cut into it and a Tennessee Lottery baseball cap with red Jamaican braids attached to it near the center console, four (4) cell phones in the trunk, and, various documents and pictures of Woodruff and Fulford throughout the passenger compartment of the vehicle. According to the MPD Towed/Recovered Report (Ex. 4), the Monte Carlo was towed to the vehicle impound lot at approximately 1:40 a.m.

Detective Britton testified that the detectives transferred both men to the MPD office located on Channel 3 Drive. Woodruff and Fulford were read their *Miranda* rights and both chose to give a statement to police. In his statement, Woodruff claimed to have found the handgun in the center console of his vehicle while driving and then placed it under the passenger seat. Fulford denied any knowledge of the weapon and was released without charge.

The next witness, Sergeant Michael Rosario ("Sgt. Rosario"), testified that at the time of Woodruff's arrest, he was serving as an officer in the MPD's Robbery division. Sgt. Rosario stated that the crime data available to the police at the time of the arrest showed that the area around the Kensington Manor Apartments was a hot spot for robberies of Hispanics and that the detectives patrol team had been deployed there on account of this information.

The defense called Celestine Evans. Evans testified that she owned the 2003 Monte Carlo driven by Woodruff. Evans stated that she is a resident of Memphis but was in North Dakota on a temporary work assignment at the time of Woodruff's arrest. Evans testified that she received a call from one of the detectives around 1 a.m. on the morning of Woodruff's arrest verifying that she was the owner of the vehicle driven by Woodruff. Evans stated that when she asked the detective on the phone about getting her car returned to her, she was told that it would be available to her at the impound lot. Evans stated that she had no further contact with the MPD until her return from North Dakota approximately five days later. According to Exhibit 4, the vehicle was released to Evans on April 8, 2009 at approximately 4:43 p.m.

Next to testify was Woodruff. In contrast to the testimony of the detectives, Woodruff testified that he did not make an illegal left turn into the Kensington Manor Apartment Complex on the night of this arrest. Rather, Woodruff testified that he was one of at least three vehicles that had pulled out into the intersection in the left turn lane under a yellow light and completed the left turn after the light had turned from yellow to red in order to clear the intersection. Woodruff also testified that he recognized the detectives' car as a po-

lice cruiser as he approached the intersection despite it being an unmarked vehicle and would therefore not have blatantly disregarded the traffic light in the way that Detective Britton had described. Woodruff also testified that after seeing the police cruiser activate its blue lights, he pulled his vehicle through the entrance to the apartment complex and parked in a designated parking spot.

The final witness to testify was Detective Billy Jackson.[1] Detective Jackson stated that the light at Comanche and Getwell had already turned red prior to the officers arriving at the intersection and that Woodruff ran the red light while making a left hand turn into the Kensington Manor Apartments. On cross examination, Detective Jackson could not remember whether there were other cars in the general vicinity but was adamant that there were no other cars in the left turn lane and reiterated that Woodruff disobeyed the red light when turning into the apartment complex. Detective Jackson also testified that Woodruff's vehicle came to a stop in the middle of the entrance to the apartment complex and not in a designated parking space, thus blocking the flow of traffic through that gate.

The court finds the testimony of the detectives to be credible and accepts their version of the events as fact. Detective Jackson's testimony mirrored that of Detective Britton concerning the events surrounding the traffic stop and the arrest. Both officers testified that their patrol car arrived at the intersection of Getwell and Comanche first; that when they arrived the light was red; that the defendant's vehicle was not already out in the intersection before the light changed to red; and, that the defendant made an illegal left hand turn into the apartments. Finally, both officers also testified consistently that Woodruff's vehicle was stopped in the entry area to the apartment complex and not in a parking space as claimed by the defendant.

## PROPOSED CONCLUSIONS OF LAW

Woodruff argues that he was stopped and detained without reasonable suspicion or probable cause.[2] He therefore contends that the government's warrantless search of his vehicle was unreasonable and in violation of his rights under the Fourth Amendment. Accordingly, Woodruff requests that the court suppress all evidence obtained during the search of his vehicle as well as any and all statements obtained as a result of the evidence obtained from the search as the "fruit of the poisonous tree."[3]

### A. Stop and Arrest of Woodruff

■ The evidence presented at the hearing shows that the officers stopped Woodruff after observing him commit a traffic violation—disregarding a red light.

---

1. Detective Jackson was not called by the government during their case in chief, but rather as a rebuttal witness. Prior to calling Detective Jackson on rebuttal, the government re-called Detective Britton. Detective Britton's rebuttal testimony was consistent with his prior testimony during the government's case-in-chief.

2. In his motion, Woodruff alleges that the passenger in his car, Fulford, was seized in violation of the Fourth Amendment and detained without reasonable suspicion or proba-

ble cause. Woodruff has no standing to assert any constitutional violation of Fulford's rights, *See Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), and any alleged violation of Fulford's rights is irrelevant to the current motion to suppress.

3. Woodruff reserved his right to file a supplemental suppression motion as to the statements based on discovery material received at the hearing.

Thus, the officers had a reasonable, articulable suspicion that Woodruff was engaged in an unlawful activity and probable cause to stop the vehicle and detain Woodruff. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see also Atwater v. Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) ("If an officer has probable cause to believe that an individual has committed even a minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). After running his driver's license, the officers discovered that there was a two-month old outstanding warrant for Woodruff's arrest on aggravated robbery charges. Thus, the officers had a lawful basis to arrest Woodruff, pat him down, and secure him in their squad car. In addition, upon frisking Woodruff, the officers discovered multiple identification cards bearing Hispanic surnames.

## B. Search of the Vehicle

The critical issue is whether the subsequent warrantless search of Woodruff's vehicle was lawful pursuant to an exception to the Fourth Amendment's search warrant requirement. The government contends that the search was justified as a search incident to arrest. In the alternative, the government argues that the search was justified under the automobile exception to the warrant requirement as well as the doctrine of inevitable discovery.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment prohibits warrantless searches and seizures, and any search conducted without a warrant is considered "per se unreasonable." U.S. Const. amend. IV; *United States v. Roark,* 36 F.3d 14, 17 (6th Cir.1994) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The Fourth Amendment's requirement of probable cause and a warrant is, however, subject "to a few specifically established and well-delineated exceptions." *Katz,* 389 U.S. at 357, 88 S.Ct. 507. The burden is on the government to prove, by a preponderance of the evidence, that the circumstances justified a warrantless search. *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Bradley,* 163 Fed.Appx. 353, 357 (6th Cir.2005) (unpublished).

### 1. Search Incident to Arrest

Woodruff argues that in light of the Supreme Court's decision in *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), his vehicle was not subject to a search incident to arrest because he was not in reaching distance of his vehicle at the time of his arrest and "there was no reason to think his vehicle contained evidence of the offense of arrest" since the arrest was for an outstanding warrant. (Def.'s Mot. 8.)

In *Gant,* the Supreme Court held that, incident to a lawful arrest, officers may conduct a warrantless search of an arrestee's vehicle and the containers therein only if there exists a "possibility that an arrestee could reach into the area that law enforcement officers seek to search," 129 S.Ct. at 1716, or if it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle," *id.* at 1719 (citing *Thornton v. United States,* 541 U.S. 615, 632, 124 S.Ct. 2127, 158

L.Ed.2d 905 (2004) (Scalia, J., concurring in judgment)). Officers are justified in the first instance by the government's legitimate interest in officer safety and the preservation of evidence, *id.* at 1716, and in the second instance, by "circumstances unique to the vehicle context," *id.* at 1719.

The court agrees with the defendant that there was no possibility he could reach into the vehicle at the time of his arrest because he was secured in the squad car, and therefore the search of his vehicle was not justified under the first prong of *Gant.* Therefore, the court must determine whether there was reason to believe the vehicle contained evidence of the offense of arrest. According to the evidence presented at the hearing and the facts as found by the court, Woodruff was arrested pursuant to an outstanding warrant issued two months earlier in connection with a robbery. In addition, at the time of his arrest, identification documents of others was found on his person. Because the basis for the arrest was a robbery and not a traffic violation, the issue under *Gant* is whether the officers had a reasonable basis to believe that the vehicle being driven by Woodruff may have contained evidence relevant to the crime of robbery. The warrant was issued roughly two months prior to the time of Woodruff's arrest. The government did not present evidence at the hearing that the detectives believed evidence relevant to the crime of robbery may be found in the vehicle driven by Woodruff, such as the vehicle was used in the robbery or that it was even his vehicle. Thus, the search incident to arrest was not valid under the second prong of *Gant.* However, evidence relevant to other robberies and identity theft was found on Woodruff. The unique circumstances of Woodruff's arrest as discussed in the next section would justify a search of the vehicle under *Gant.*

### 2. Automobile Exception

At the hearing, the government raised, as an alternative justification for the detectives' search of Woodruff's vehicle, the automobile exception to the warrant requirement. The government takes the position that the information concerning robberies of Hispanics that the detectives had available to them at the time of the stop, the fact that the stop took place around midnight, and the discovery of identification cards bearing Hispanic surnames all combined to create probable cause for Woodruff's arrest independent of his warrant and therefore justified the detectives' decision to search his vehicle.

An exception to the warrant requirement exists for the search of automobiles due to their mobility as well as the reduced expectation of privacy that comes with being in an automobile. *California v. Carney,* 471 U.S. 386, 390–391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). A warrantless arrest must be supported by probable cause to be valid. *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Probable cause to conduct a warrantless arrest exists when officers have, at the moment of arrest, "facts and circumstances within their knowledge and of which they had reasonably trustworthy information. sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

The probable cause necessary to support a warrantless arrest is no less than the probable cause required for issuance of an arrest warrant. In other words, there must be probable cause to believe (1) an offense has been committed; and (2) the

person to be arrested has committed it. *See* Fed.R.Crim.P. 4(a) (probable cause findings necessary to issue a warrant for an arrest). Probable cause to search has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir.1995). Determination of probable cause is made by an analysis of "the totality of circumstances." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317; *Padro,* 52 F.3d at 122.

Here, an analysis of the totality of the circumstances surrounding the traffic stop and arrest supports a finding of probable cause to search Woodruff's vehicle. The detectives testified that, at the time of the traffic stop, the area surrounding the Kensington Manor Apartments was known to police as a hot spot for robberies of Hispanics, particularly at night. Detective Britton testified that he observed both the driver and the passenger making furtive movements as the detectives effectuated the stop. A search of Woodruff's person revealed three identification cards bearing Hispanic surnames. Given the nature of the area, the detectives' personal observations, and the discovery of the identification cards, the court finds that the detectives' decision to search Woodruff's vehicle was supported by probable cause.[4] Because the detectives' search of Woodruff's vehicle was reasonable under the Fourth Amendment, the court finds no reason to suppress any of the physical or testimonial evidence obtained by the detectives either directly or indirectly as a result of their search.

### 3. Inventory Search

The government also argues that the evidence would have been found during an inventory search following impoundment of the car and is therefore admissible under the inevitable discovery doctrine. *See United States v. Kennedy,* 61 F.3d 494, 499 (6th Cir.1995). An inventory search is an exception to the warrant requirement if the search is conducted pursuant to police policy. *Colorado v. Bertine,* 479 U.S. 367, 374, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 372, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Woodruff argues that the inventory search was not properly conducted pursuant to Memphis Police Department policy for two reasons: (1) the vehicle was located on private property; and (2) Fulford could have driven the vehicle from the scene. It is undisputed that the vehicle was impounded, an inventory search was performed, and the vehicle was towed to the MPD impound lot. (Ex. 4.) Because of the court's finding that the officers' search was justified by independent probable cause under the automobile exception to the warrant requirement, the issue of whether the officers conducted a proper inventory search is moot. Nevertheless, if it is necessary to consider the issue, the court recommends that the motion to suppress be denied on the basis of the inevitable discovery doctrine for the reasons that follow.

At the hearing, the government provided the court with documentary evidence that Fulford, Woodruff's passenger, did not have a valid driver's license at the time of the arrest (Ex. 1), as well as a copy of the MPD's policy on inventory searches which was in effect at the time of Woodruff's arrest (Ex. 2). Considering all of

---

4. In finding probable cause to search the vehicle, the court neither relies on nor finds it necessary to address Woodruff's statement to

the officers concerning the identification cards found in the car.

the evidence presented, the court finds that discovery of the handgun was inevitable under the circumstances. First, the Department of Transportation Report (Ex. 1) affirmatively negates Woodruff's claims that Fulford "could have easily driven the car from the scene" as it makes clear that Fulford's driving privileges were revoked on the date of the arrest. Second, the testimony elicited at the hearing shows that Woodruff's vehicle would have been towed and inventoried in accordance with the MPD policy in effect at the time. The policy in effect allowed arrestees to leave their vehicle only when: (1) it was legally parked on public property; (2) it was legally parked on private property and the owner of the property had given consent; or, (3) the arrestee authorized a third party who was not under arrest to legally park the vehicle. (Ex. 2, 3–4.). The testimony at the hearing showed that Woodruff's vehicle was on private property, not legally parked, and that no third parties were present that could have legally parked Woodruff's vehicle given that the vehicle's owner was in North Dakota at the time of the arrest and Woodruff's passenger, Fulford, was in police custody and did not possess a valid license at that time. Woodruff's car would have therefore been towed pursuant to the MPD's policies leading to the inevitable discovery of the handgun. *See United States v. Vite–Espinoza,* 342 F.3d 462, 471 (6th Cir.2003).

C. *Miranda* Warning and Woodruff's Statement

Woodruff seeks to suppress his statement based on the fruit of the poisonous tree doctrine. Woodruff has neither alleged a failure on the part of the officers to give a *Miranda* warning nor any coercion on the part of the officers.[5] Having found the search valid, the court finds no basis

on which to suppress Woodruff's statement.

## IV. RECOMMENDATION

For the reasons expressed above, it is recommended that the defendants' motion to suppress be denied.

Respectfully submitted this 13th day of May, 2010.